# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 2591 | **DATE** | 1/23/2001 |
| **CASE TITLE** | Zeidler vs. A&W Restaurants | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated on the attached order, A&W's motion for summary judgment (36-1) is granted, and plaintiff's motion for partial summary judgment (33-1) is denied. Plaintiffs' motion to strike Andrew Hester's affidavit (50-1) is denied as moot. Judgment is entered in favor of defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | number of notices | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JAN 2 5 2001 | | |
| ✓ | Docketing to mail notices. | date docketed | | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | | |
| OR | courtroom deputy's initials | DOCKETING 01 JAN 24 PH 5: 15 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL W. ZEIDLER, NANCY ZEIDLER and R.W. HOSPITALITY CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No.    99 C 2591 |
| A&W RESTAURANTS, INC., | ) ) ) | |
| Defendant. | ) | |

DOCKETED
JAN 2 5 2001

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In March 1998, A&W Restaurants, Inc. terminated the franchise held by Russell Zeidler,

Nancy Zeidler and R.W. Hospitality Corporation. Plaintiffs have sued A&W for breach of

contract and violation of the Illinois Franchise Disclosure Act based on a claim of wrongful

termination. Plaintiffs have also sued for breach of contract based on A&W's purported failure

to provide updates to operating manuals. This case is before the court on A&W's motion for

summary judgment and plaintiffs' cross-motion for partial summary judgment with respect to the

claims concerning the manual updates. Plaintiffs have also moved to strike the affidavit of their

former expert, Andrew Hester, which A&W has submitted in support of its motion for summary

judgment. For the reasons that follow, the Court denies plaintiffs' motion for partial summary

judgment and grants summary judgment in favor of A&W. Because the Court did not consider

1



or rely upon Hester's affidavit in reaching its conclusions, plaintiffs' motion to strike is denied as moot.

## FACTUAL BACKGROUND

In 1991, A&W and plaintiffs entered into a written License Agreement under which A&W granted them a license to operate an A&W restaurant in the Stratford Square Mall in Bloomingdale, Illinois. The License Agreement was to last until December 31, 2011, unless otherwise terminated in accordance with the terms of the agreement. A&W was entitled to terminate the License Agreement if, among other things, plaintiffs defaulted "in the performance or observance of any of [their] obligations . . . and such default continue[d] for a period of thirty (30) days after written notice to the Licensee." License Agreement, ¶ 17.0.

Under the relevant terms of the License Agreement, A&W was required to provide plaintiffs with a Restaurant Operations Manual and any amendments or supplements to the Manual. License Agreement ¶ 3.0. Plaintiffs' failure to "faithfully and completely follow and observe all standards, specifications, requirements, instructions and procedures contained [in the Restaurant Operations Manual] and in any amendments and supplements thereto" constituted a material breach of the License Agreement. *Id.* at ¶¶ 3.2-3.4. Further, plaintiffs were required to "comply with all applicable governmental laws and regulations, including health, sanitation and environmental codes," *id.* ¶ 3.9, and to maintain liability insurance for the premises, *id.* ¶ 12.0.

To assist plaintiffs in obtaining financing for the franchise, A&W provided them with a pro forma financial statement reflecting anticipated annual sales. The pro forma was prepared at plaintiffs' request, and it expressly stated that actual results would differ. As the years passed, the restaurant consistently lost money. Early in 1997, Russell Zeidler complained to A&W about

the restaurant's failure to attain the financial goals set forth in the pro forma. *See* Plfs.' 12(n) Stmt., Ex. 2.

Plaintiffs' relationship with A&W deteriorated further in late 1997. On November 25, 1997, A&W's Franchise Area Manager, David Martin, visited the restaurant. In a memorandum sent to Russell Zeidler, Martin enumerated several areas of concern regarding the cleanliness and management of the restaurant. Plf.'s 12(n) Stmt., Ex. 6. Martin advised Zeidler that his concerns were serious, and he directed Zeidler to remedy the defects within 30 days, at which time Martin would come in to perform a Quality Assurance Report ("QAR") on the restaurant. *Id.* Zeidler did not respond to the November 1997 memorandum. R. Zeidler Dep. at 19.

On December 30, 1997, Martin returned to the restaurant to perform the QAR. Neither Russell nor James Zeidler, Russell's brother and also an A&W franchisee in a different location, was present.[1] Martin gave the restaurant a score of 59%, far below the passing grade of 80%. Plf.'s 12(n) Stmt., Exs. 9 & 10.[2] Additionally, the mall manager informed Martin that the restaurant's sliding glass door had fallen off its rails the day before and that Zeidler had been unable to provide proof of insurance. *Id.*, Ex. 10. Martin also took photographs depicting dirty restrooms, trash on the floor, and other generally unsanitary conditions. *Id.*, Ex. 20. Martin sent

---

[1] Plaintiffs were absentee owners of their franchise, a fact that A&W knew upon entering the relationship. Plaintiffs hired managers to run the restaurant, firing the last of those managers in January 1998. During times when no manager was running the restaurant, James Zeidler came in at least once a week to oversee the restaurant's operations. It is uncontested that there was no permanent manager on duty at plaintiffs' restaurant from January 1998 until the restaurant closed in March.

[2] Prior to December 30, 1997, the restaurant had received passing grades on all QARs, most recently in July of 1997.

3

Zeidler a detailed memorandum dated December 31, 1997 informing him of A&W's concerns regarding the condition of the restaurant. *Id.*, Ex. 10. Martin also informed Zeidler that his failure to carry insurance constituted a violation of Section 12.0 of the License Agreement, and he invited Zeidler to call if he required any assistance remedying the problems. *Id.*, Ex. 10. Zeidler did not respond. *See* R. Zeidler Dep. at 24. Six days later, on January 6, 1997, Martin returned to the restaurant and found no improvement. Martin Dep. at 101-106; Martin Decl. ¶ 15.

On January 7, 1998, A&W sent plaintiffs a Notice of Intent to Terminate the franchise, citing the 47 operational deficiencies noted in the QAR and plaintiffs' failure to carry insurance on the restaurant. *Id.*, Ex. 13. The letter gave plaintiffs until February 16, 1998 (approximately 40 days) to get back into compliance with their License Agreement and to avoid termination. *Id.* On January 15, 1998, Russell Zeidler telephoned A&W's paralegal, who confirmed that unless plaintiffs corrected the problems identified in the Notice of Intent to Terminate, A&W would terminate the franchise on or about February 16. *Id.*, Ex. 14. On January 12, Paul Neirzwicki, A&W's Vice President of Operations, sent plaintiffs another letter detailing the operational defaults, the steps they needed to take to remedy the defaults and the dates for compliance, and requesting that Russell Zeidler advise him of the Corrective Action Plan implemented to correct the problems. *See* R. Zeidler Dep. at 27. Russell Zeidler did not follow up with Nierzwicki. *Id.*

Despite A&W's warnings, conditions at the restaurant did not improve. On January 31, 1998, Martin visited the restaurant with Mike Phelan, another A&W franchisee interested in acquiring plaintiffs' store. Both Martin and Phelan testified that the restaurant was dirty and disorganized. *See* Phelan Decl. ¶ 4; Martin Decl. ¶16.

4

During February, as termination loomed, A&W made several attempts to reach Russell Zeidler. On February 2, Martin spoke with Zeidler about operations and suggested that he hire a replacement manager for the restaurant or think about selling it. *See* Martin Decl. ¶ 17. On February 24, 25 and 26, A&W representatives left messages for Zeidler at the restaurant and at his home. *See* Kohler Decl. ¶ 19. Zeidler's only response was a letter dated February 27, in which stated that he planned to close the restaurant on March 2 because the tone and content of the January 7 Notice of Intent to Terminate indicated that termination was unavoidable. *See* Plfs.' 12(n) Stmt., Ex. 17.

On March 11, 1998, Martin again visited the restaurant. Martin Decl. ¶ 18. Although Martin noted some improvement in the restaurant's condition, he still found some operational defaults, which he documented with a series of photographs. Martin Decl. ¶ 18; Plfs.' 12(n) Stmt., Ex. 21. That same day, after the restaurant closed for the night, Jim Zeidler took his own photographs, which depict a sparkling clean restaurant. *Id.*, Ex. 22. Plaintiffs did not show these photographs to A&W prior to filing this lawsuit. R. Zeidler Dep. at 46. Plaintiffs did not reopen their restaurant after March 11, 1998. On March 25, A&W sent plaintiffs a Notice of Termination.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable

jury could return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court first evaluates A&W's motion, construing the evidence in the light most favorable to plaintiffs.

## I.     Breach of Contract – Wrongful Termination

A&W claims that it had good cause to terminate plaintiffs' franchise because (1) plaintiffs abandoned their franchise twelve days before A&W actually terminated it; (2) plaintiffs failed to procure liability insurance for their store in violation of Section 12.0 of the License Agreement; and (3) plaintiffs failed to remedy the serious operational defects identified in the December 30, 1997 QAR. A&W argues that any one of these reasons standing alone constitutes lawful grounds for termination and that in any event, plaintiffs' claims for lost future profits cannot stand. In response, plaintiffs argue that A&W forced them to close their store; that failure to obtain insurance for the restaurant was not a valid reason for termination; and that the QAR was not a proper basis for termination. The Court finds that A&W's termination of the License Agreement was justified on the basis of the insurance default alone.

### A.     Plaintiffs' Failure to Procure Insurance Provided Adequate Lawful Grounds for Termination.

As we stated earlier in ruling on A&W's motion to dismiss, plaintiffs' failure to obtain insurance for their restaurant constituted a clear violation of the License Agreement and a valid reason for termination under Section 17, which permitted termination for violation of "any" of the provisions of the Agreement.[3] Plaintiffs admit that they did not maintain liability insurance for

---

[3]In their opposition to A&W's motion, plaintiffs essentially invite the Court to reconsider its earlier ruling, *Zeidler v. A&W Restaurants, Inc.*, No. 99 C 2591, 2000 WL 122616, at *2 (N.D. Ill. Jan. 25, 2000). Plaintiffs, however, present no new arguments supporting

their restaurant in 1997 and 1998. Further, it is undisputed that plaintiffs did not obtain insurance even after they were informed on January 7, 1998 that this default would result in termination.

The evidence provided by A&W shows that the insurance default alone provided grounds for termination. The insurance default was listed as grounds for termination in both the January 7 Notice of Intent to Terminate and the March 25, 1998 Notice of Termination. Further, Larry Kohler, A&W's Vice President of Franchise Contract Administration, testified that plaintiffs' failure to procure liability insurance was serious enough by itself to constitute grounds for termination, especially because the restaurant's glass door had fallen off its railings. Kohler Decl. ¶ 21.

In response, plaintiffs argue that termination for the insurance default was unlawful because A&W had not terminated any other franchise on that basis. This argument is unpersuasive. A&W's treatment of its other franchisees is irrelevant to its treatment of plaintiffs. *See The Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 279 (7th Cir. 1992) (fact that company may have treated other franchisees more leniently was "no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket").

Plaintiffs also argue that the insurance default was merely a pretext for termination, and that A&W had ulterior motives, namely, that it wished to retaliate against plaintiffs for

reconsideration, nor do they contend that the Court misapprehended their earlier arguments. As such, plaintiffs have provided no proper grounds for reconsideration. *See, e.g., Jefferson v. Security Pacific Financial Services, Inc.*, 162 F.R.D. 123, 125 (N.D. Ill. 1995) (motion to reconsider should not seek "instant replay"); *In re Oil Spill by the "Amoco Cadiz,"* 794 F. Supp. 261, 267 (N.D. Ill. 1992) (motion to reconsider should not "rehash" old arguments).

complaining about the allegedly inaccurate financial data that A&W had provided or that it wanted to sell plaintiffs' franchise to another franchisee without consulting plaintiffs. Aside from the fact that insufficient evidence of improper motives exists even when viewed in the light most favorable to plaintiffs, A&W's motives for terminating plaintiffs' franchise are immaterial because, as discussed above, the insurance default was a sufficient and legitimate ground for termination. *See Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 993, 466 N.E.2d 958, 973-74 (1984) (ulterior motive for franchise termination irrelevant as long as legitimate grounds for termination exist); *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 589 (7th Cir. 2000) (emphasizing that "[i]f a party has a legal right to terminate [a] contract . . . its motive for exercising that right is irrelevant").

Finally, plaintiffs argue that A&W waived the insurance default as grounds for termination. In an affidavit, Russell Zeidler says that in a January 15, 1998 telephone conversation with A&W's paralegal, Cindy Michalski, Michalski orally "withdrew [the insurance default] as a termination criteria [sic]." R. Zeidler Aff. ¶ 26. But Michalski's follow-up letter to Zeidler, though it did not specifically reference the insurance violation, attached and expressly referred to the original January 7 Notice of Intent to Terminate, which informed plaintiffs that their failure to obtain liability insurance warranted termination. Zeidler's uncorroborated statement is insufficient under the circumstances to support a claim of waiver. The Seventh Circuit has held that an uncorroborated claim of oral waiver of a significant contract term is insufficient under Illinois law. *Cole Taylor Bank v. Truck Insurance Exchange*, 51 F.3d 736, 739-40 (7th Cir. 1995).

In sum, plaintiffs have not introduced evidence sufficient to create a genuine issue of material fact as to A&W's right to terminate the License Agreement based on the insurance default. *See Original Great American Chocolate Cookie Co.*, 970 F.2d at 278-79; *McDonald's Corp. v. C.B. Management Co.*, 13 F. Supp. 2d 705, 712 (N.D. Ill. 1998). Summary judgment in A&W's favor on the wrongful termination contract claim is therefore proper.

**B.    The Operational Deficiencies and Plaintiffs' Abandonment of the Restaurant Also Constituted Grounds for Termination.**

Even if the insurance default did not provide sufficient lawful grounds for the termination, the termination was justified because plaintiffs failed to meet A&W's quality assurance standards and because plaintiffs abandoned their restaurant prior to the final notice of termination.

**1.    Plaintiffs' Restaurant Fell Short of A&W's Quality Assurance Standards.**

Although plaintiffs maintain that their restaurant was clean and that the December 30, 1997 QAR was fraudulent, the record tells a different story. Martin's photographs of the restaurant taken on December 30, 1997 and March 11, 1998 depict unsanitary conditions.[4] Notably, the December 30 photographs show food stored on the floor of the walk-in refrigerator, filthy sinks, and dirty bathrooms. Plfs.' 12(n) Stmt., Ex. 20. The March 11 photographs show little improvement in the restaurant's condition. Plfs.' 12(n) Stmt, Ex. 21. These photographs provide contemporaneous support for plaintiffs' failing score on the December 30 QAR.

---

[4] The DuPage County Health Department also found problems with the conditions of plaintiffs' store. In February 1998, the health inspector deducted 23 points from plaintiffs' overall score on cleanliness grounds. *See* Plfs.' 12(n) Stmt., Ex. 32. Customers also complained about unsanitary conditions in the restaurant. *See* Kohler Decl., Group Ex. 4.

Plaintiffs have not produced evidence that would permit a reasonable jury to conclude either that the QAR was fraudulent or that Martin's photographs do not accurately depict the conditions of the restaurant. Neither Russell nor James Zeidler was present at the restaurant on the days that the QAR was conducted or the photographs were taken; thus neither has personal knowledge of the restaurant's conditions on those dates. Plaintiffs have failed to produce an affidavit of any other employee or manager who has personal knowledge of the conditions of the restaurant on the days of Martin's visits. The only evidence plaintiffs have offered in opposition is a series of photographs taken on March 11 after the restaurant was closed. *See* Plfs.' 12(n) Stmt., Ex. 22. Although these photographs depict the restaurant to be clean and in good condition at that time, they do nothing to show that the restaurant met A&W's quality requirements when Martin visited the restaurant or during periods when the restaurant was open to the public.

Plaintiffs also argue, relying on Martin's testimony that a failing QAR should not by itself mandate termination, that the December 30 QAR could not form the basis for termination. If the QAR were the only evidence of operational deficiencies in plaintiffs' restaurant, and if A&W had terminated the franchise based on the QAR without making any attempt to work with plaintiffs, the Court might be inclined to agree. The record, however, is replete with evidence of repeated quality violations by plaintiffs between November 1997 and March 1998. A&W sent numerous detailed notices to plaintiffs to inform them of the specific problems to be remedied, and it repeatedly offered its help in getting plaintiffs' restaurant back into compliance to avert termination. Even if plaintiffs believed that A&W's concerns were false, they failed to make any effort to disabuse A&W of that notion. Based on the evidence of the restaurant's operational

10

deficiencies and plaintiffs' apparent failure to cure them or work with A&W, a reasonable jury could conclude that A&W had sufficient lawful grounds for the termination.

## 2. Plaintiffs Abandoned the Restaurant Prior to Final Termination.

A&W also argues that no wrongful termination occurred because plaintiffs abandoned the restaurant prior to the termination of the franchise. It is undisputed that the Notice of Termination was sent out on March 25, 1998. It is also undisputed that plaintiffs had closed the restaurant twelve days earlier, on March 13, 1998. A franchisee's voluntary abandonment of its store defeats a claim of wrongful termination. *See Moro v. Shell Oil Co.*, 91 F.3d 872, 875 (7th Cir. 1996) (no wrongful termination under the Petroleum Marketing Practices Act where franchisee abandoned franchise after receiving notices of license agreement violations); *Derson Group, Ltd. v. Right Management Consultants, Inc.*, 683 F. Supp. 1224, 1228 (N.D. Ill. 1988) (granting summary judgment on wrongful termination charge where franchisee formally dissolved relationship following receipt of two notices of termination but before the termination was effectuated).

Plaintiffs argue in response that they did not abandon the restaurant but rather had no choice but to close because the Notice of Intent to Terminate indicated that termination was a foregone conclusion. For support, plaintiffs rely on Section 17.0 of the License Agreement, which states that "[a] repetition of within a one-year period of any such default shall justify the Company in terminating this Agreement upon written notice to the Licensee without allowance for any curative period." Plaintiffs' argument fails primarily because it is contradicted by Russell Zeidler's deposition testimony, in which he admitted that he understood the difference between a Notice of Intent to Terminate and a Notice of Termination. R. Zeidler Dep. at 30. Further, the

11

argument fails because the Notice of Intent to Terminate expressly gave plaintiffs more than 30 days to cure the defects described therein. No reasonable person could read this Notice as indicating that termination was inevitable. Plaintiffs have cited no authority to support the proposition that the Notice of Intent to Terminate effectuated a termination under these circumstances.

## II. Illinois Franchise Disclosure Act – Wrongful Termination

Plaintiffs also claim that A&W's termination of the franchise violated the Illinois Franchise Disclosure Act ("IFDA"), which provides that a franchisor may not effect a termination without "good cause." *See* 815 ILCS § 705/19(a). "Good cause" under the IFDA includes the franchisee's failure to comply with a lawful contract provision. *See* 815 ILCS 715/19(b). The requirement that the franchisee supply insurance is a lawful contract provision. *Cf. Lulich v. Sherwin-Williams Co.*, 799 F. Supp. 64, 69 (N.D. Ill. 1992) (provision in construction contract requiring contractor to obtain liability insurance is lawful). As discussed above, it is undisputed that plaintiffs failed to carry insurance on the restaurant in 1997 and 1998 despite A&W's warnings that this violated the License Agreement and could result in termination. Also as discussed above, A&W has demonstrated that the insurance default alone constituted sufficient grounds justifying termination. Accordingly, summary judgment in favor of A&W is proper on plaintiffs' IFDA claim.

## III. Breach of Contract – Failure to Provide Operations Manual Updates

The Court next considers plaintiffs' breach of contract claim based on A&W's alleged failure to provide updates to its Operations Manuals. This claim is the subject of cross-motions

for summary judgment. The Court will first deal with A&W's motion, thereby viewing the evidence in the light most favorable to plaintiffs.

The License Agreement required A&W to supply plaintiffs with a Restaurant Operations Manual and "all amendments or supplements" thereto throughout the term of the Agreement. License Agreement, § 3.0. A&W concedes that a genuine issue of material fact exists as to whether plaintiffs actually received the numerous updates to the Manual. The issue is whether plaintiffs sustained any damages resulting from A&W's alleged failure to provide the updates. A&W argues that summary judgment in its favor is proper because the damages plaintiffs seek are barred on equitable principles and in any event are not causally connected to the alleged breach.

Plaintiffs are essentially seeking rescission. They seek the return of their $15,000 initial license fee, $54,739 in monthly license fees, and $15,680 in monthly advertising fees. A&W asserts that plaintiffs' claim for rescission is stale because plaintiffs had learned of the manual updates through A&W correspondence and elected to perform their contractual obligation even though they had not received the updates. Plaintiffs do not dispute that they were members of the National A&W Franchise Association ("NAWFA"), and they do not contest that they received NAWFA minutes discussing proposed changes and amendments to the Operations Manual, but they nevertheless claim that they did not know of the existence of the manual updates until discovery in this suit. *See* Plf.'s Reply to A&W's 12(n) Stmt., ¶16.

Assuming without deciding that A&W's failure to provide updates and amendments to the Operations Manual would constitute grounds for rescission, plaintiffs' concessions of fact are fatal to their claim for rescission damages. A party that wishes to rescind a contract must do so promptly, and an election to proceed with performance on the contract is inconsistent with the

remedy of rescission. *See generally Diedrich v. Northern Illinois Publishing Co.*, 39 Ill. App. 3d 851, 855, 350 N.E.2d 857, 864 (1976) (party's delay barred it from seeking rescission); *Lichter v. Goss*, 232 F.2d 715, 720 (7th Cir. 1952) (party could not rescind construction contract after electing to proceed with the contract); *Swartz v. Schaub*, 826 F. Supp. 274, 277 (N.D. Ill. 1993) (party seeking to rescind contract on grounds of fraud must act upon rescission promptly). Plaintiffs continued performing under the License Agreement despite being on notice that they were not receiving updates to the Operations Manual. Accordingly, plaintiffs are barred from seeking rescission.

Even if plaintiffs' claim for rescission damages were not stale, A&W argues that plaintiffs cannot prove that A&W's alleged failure to provide updates to Operations Manuals caused plaintiffs any damages. The Court agrees with A&W. A plaintiff seeking damages for breach of contract must establish a causal connection between the alleged breach and the alleged injury. *See Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1296-97 (7th Cir. 1993); *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1985). To establish this connection, plaintiffs offer only Russell Zeidler's affidavit, which states that the restaurant was unprofitable for five years as a result of A&W's failure to provide updates to the Operations Manual. *See* Plfs.' Mot. for Partial Summ. J., Ex. A, ¶ 14. This conclusory and unsupported statement is not a sufficient basis to permit a jury to decide that plaintiffs suffered damages arising from A&W's alleged breach. *See Slowiak*, 987 F.2d at 1297-98 (affirming summary judgment because plaintiff's unsupported allegation that he could have made more money had defendant not engaged in price fixing was insufficient to show injury fairly traceable to defendant's conduct). Indeed, Zeidler's affidavit contradicts other statements in which he

attributed the restaurant's unprofitability to factors other than A&W's failure to send the updates to the Operations Manual. Specifically, in March 1997 Zeidler complained to A&W that the restaurant was unprofitable because of the "physical capabilities of the Stratford Square location" and "reduced mall traffic." *Cf. Slowiak*, 987 F.2d at 1297 (affirming summary judgment where plaintiff's earlier testimony that market forces controlled prices contradicted subsequent unsupported affidavit).

Because plaintiffs have failed to produce evidence sufficient to create a genuine issue of material fact regarding the existence of damages flowing from A&W's alleged failure to provide updates to the Operations Manual, summary judgment in A&W's favor is proper.

## CONCLUSION

For the foregoing reasons, A&W's motion for summary judgment [Item 36-1] is granted, and plaintiffs' motion for partial summary judgment [Item 33-1] is denied. Plaintiffs' motion to strike Andrew Hester's affidavit [Item 50-1] is denied as moot. The Clerk is directed to enter judgment in favor of defendant.

Dated: January 23, 2001

MATTHEW F. KENNELLY
United States District Judge

15